JOSEPH R.W. LAMONTAGNE & others[1] vs. LOUISE T.
KNIGHTLY & another.[2]

No. 89-P-1306.

Essex. January 18, 1991. - June 12, 1991.

Present: PERRETTA, GILLERMAN, & IRELAND, JJ.

*Taxation,* Real estate tax: foreclosure of right of redemption, low value
land. *Due Process of Law,* Notice. *Notice,* Tax taking. *Real Property,*
Foreclosure of tax title.

Discussion of cases addressing the constitutional adequacy of statutory no-
tice requirements with respect to municipal takings of real property for
failure of the owners to pay assessed taxes. [651-654]
The notice requirements of G. L. c. 60, § 79, for the foreclosure, taking
and sale of land of low value by a municipality for nonpayment of taxes
were adequate to protect the due process rights of owners who could not
be located with reasonable diligence by the town or who had actual
knowledge that taxes were due and failed to pay them. [654-658]
The twenty-year limitations period set forth in G. L. c. 60, § 80C, barred a
1988 action challenging a 1947 conveyance of land by a municipality
that had taken the land pursuant to G. L. c. 60, § 79. [658-659]

CIVIL ACTION commenced in the Land Court Department
on January 19, 1988.

The case was heard by *Robert V. Cauchon,* J.

*John D. Hodges, Jr. (Ignatius R. J. Piscitello* with him)
for the plaintiffs.

*David F. Bernardin* for the defendants.

IRELAND, J. In 1988, the plaintiffs filed a complaint in the
Land Court, claiming that the town of Methuen had failed to
notify them of two land takings in 1939 and 1944 for non-
payment of taxes and of the subsequent sale of the land,
thereby depriving them of due process of law and making the
takings invalid. The Land Court entered a judgment for the
defendants, holding that (1) the procedure followed by the

[1]Germaine Lamontagne, Lena Vitale, Blanche L. Silva.
[2]William E. Knightly.

town complied with the requirements of G. L. c. 60, § 79, for sale of low value land taken for nonpayment of taxes and (2) G. L. c. 60, § 80C, barred the plaintiffs' petition. The plaintiffs appealed to this court. We affirm.

We accept the findings of fact of the judge below because they are not clearly erroneous. Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974). The dispute involves a piece of land located in the town of Methuen (town) known as the "Batty Lot." On March 14, 1925, Angelina Lamontagne acquired title to the Batty Lot. She was then married to Remi Lamontagne; the plaintiffs Lena Vitale, Blanche L. Silva, and Joseph Lamontagne are their children, and the plaintiff Germaine Lamontagne is the wife of Joseph. From 1923 to some time in 1928, Joseph, Lena, Blanche, and Rose Alba Lamontagne and their parents lived on the property. On August 27, 1928, Angelina died intestate, and her husband, Remi, was appointed administrator of her estate. The probate of her estate showed that the Batty Lot, her only listed asset, was appraised at a value of six hundred dollars and passed to her husband and the children. G. L. c. 190, §§ 1(2) & 3.

In the latter part of 1928, Remi Lamontagne placed Joseph, Blanche, and Lena in an orphanage in the town and, apparently, kept Rose Alba with him. On October 14, 1930, Remi died. The record contains no evidence to indicate that his estate was ever probated. Joseph remained in the orphanage until 1931 or 1932 when, at the age of approximately thirteen, he went to live with an uncle in West Andover. Blanche and Lena remained in the orphanage until approximately 1933, when Blanche was about sixteen years of age and Lena about nineteen years of age. Rose Alba died in 1931.

In September, 1938, the town made a demand upon "Remi Lamontagne et al" for nonpayment of taxes for the year 1937, and in June, 1939, the town effected a taking of the Batty Lot for the nonpayment of taxes. In April, 1942, an affidavit to foreclose tax title land of low value was issued as to the Batty Lot. The affidavit stated that the land had

been advertised in a local newspaper and that notice of the sale had been posted as required by G. L. c. 60, § 79, and the Land Court judge found that the affidavit "evidence[d] the Commissioner's compliance with the notice requirements set forth under G. L. c. 60, § 79." On June 22, 1942, the town conveyed the Batty Lot to Michael Silva, brother-in-law of the plaintiff, Blanche Lamontagne Silva. Two years later, on or about November 27, 1944, the town effected a taking of the Batty Lot for nonpayment of taxes assessed to Michael Silva for the year 1943.

In 1946, after being contacted by Michael Silva, Joseph Lamontagne acquired the Batty Lot from him, taking title in the name of Joseph and Germaine Lamontagne, husband and wife, as joint tenants. Joseph then paid fifty-two dollars in real estate taxes to the town. He never again paid any real estate tax on the property.

In February, 1947, the town again issued an affidavit to foreclose tax title land of low value with respect to the Batty Lot. As did the 1942 affidavit, this affidavit stated that the land had been advertised in a local newspaper and that the posting requirement of G. L. c. 60, § 79, had been met, and the Land Court judge found the affidavit "evidence[d] the Commissioner's compliance with notice requirements as set forth in G. L. c. 60, § 79." By an April, 1947, treasurer's deed, the town conveyed the Batty Lot to William E. Knightly and Alfred Knightly.[3] The treasurer's deed to the Knightlys listed Joseph R.W. Lamontagne and Germaine Lamontagne along with Michael Silva as interested persons served with notice of sale by registered mail under G. L. c. 60, § 80A. All of the foregoing (the conveyances, affidavits, deeds, as well as the two tax takings) are recorded in the Essex North District registry of deeds. The defendants, William and Louise Knightly, are the current holders of rec-

---

[3] On July 30, 1970, the defendants, individually and as executors under the will of Alfred M. Knightly and L. Helen Knightly, conveyed the Batty Lot to a "straw" (Evelyn H. Alberts) who immediately reconveyed the property to the defendants.

ord title to the Batty Lot and have paid all real estate taxes due thereon since 1947.

The Land Court judge also found that, except for the single tax payment made by Joseph in 1946, the record failed to reveal that the plaintiffs used, occupied, rented out, visited, improved, or paid outstanding taxes on the property after their parents' deaths.

To summarize, before the town took the Batty Lot in 1939, the tax assessment and demand were sent to "Remi Lamontagne et al." The last recorded deed of the property ran to Angelina, Remi's wife, who died intestate. Her estate was probated, and Remi and the children were listed as heirs. Remi died in 1930; there were no probate proceedings, and his three surviving children (Joseph, Blanche and Lena), who had earlier been placed in an orphanage (in Methuen) by their father after their mother's death, had by the time of the tax taking left the orphanage and were in parts unknown. (Except for Joseph,[4] the record sheds no light on the children's whereabouts after leaving the orphanage.) As already stated, the town's demand was directed to "Remi Lamontagne et al."; the children were not served with the demand or with notice of the subsequent taking.[5] Aware of no reason not to, the town took the land. The subsequent foreclosure in 1942 was under G. L. c. 60, § 79, for land of low value; service of notice was not required and was not given. Michael Silva, Blanche Lamontagne Silva's brother-

---

[4] Joseph testified, and the judge found, that after he left the orphanage, he lived with an uncle on Beacon Street in West Andover; according to his testimony he was living at that address in 1939. From 1940 to 1945, he served in the armed forces.

[5] The service of the demand on Remi Lamontagne complied with State statutory requirements. G. L. c. 60, § 16 (as then and now in effect), provided, in pertinent part, that "[i]f the heirs of a deceased person, co-partners or two or more persons are jointly assessed, service need be made on only one of them." As Remi's estate was never probated, the records in the county registry of deeds and registry of probate would have indicated that he and the children were the owners of the property as heirs of Angelina. G. L. c. 60, § 56 (as then and now in effect), also provided that "[t]he assessment, sale or taking may be made in the name of one or more of the record owners at the date of assessment, and if so made, shall . . . be deemed to be in the name of the owner thereof. . . ."

in-law, then acquired record title from the town. He was the record owner in 1944, when the town took the property the second time. Joseph, who had been serving in the United States Army from 1940 to 1945, acquired the property from Silva in 1946 and paid the real estate taxes once, but never again. The 1947 foreclosure was also under G. L. c. 60, § 79.

*Foreclosures of tax title of land of low value under G. L. c. 60, § 79.* This case is not the first challenge[6] to the constitutional validity of G. L. c. 60, § 79,[7] which governs the

---

[6]For other cases construing and upholding the constitutionality of G. L. c. 60, § 79, see, e.g., *Napier* v. *Springfield*, 304 Mass. 174 (1939); *Guaranty Mort. Corp.* v. *Burlington*, 385 Mass. 411, 418-420 (1982); *Hilde* v. *Dixon*, 16 Mass. App. Ct. 981 (1983); *Robertson* v. *Plymouth*, 18 Mass. App. Ct. 592 (1984).

[7]General Laws c. 60, § 79, as appearing in St. 1941, c. 594, § 1, provided in pertinent part at the time of the 1942 and 1947 foreclosures:

"After two years from the taking or purchase by a town of any parcels of land for non-payment of taxes, the commissioner may, and on written application of the town treasurer shall, inquire into the value of such parcels and the validity of tax titles held thereon. As a part of such inquiry, the commissioner shall, upon written request therefor by any person in interest, hear such person relative to any matter pertaining to such inquiry. If the commissioner is of opinion that such parcels are of insufficient value to meet the taxes, interest and charges, and all subsequent taxes and assessments thereon, together with the expenses of a foreclosure under section sixty-nine, that none of such parcels exceeds one thousand dollars in value, and that the facts essential to the validity of the tax titles on such lands have been adequately established, he shall make affidavit of such finding, which shall be recorded in the registry of deeds for the district wherein the land lies.

"The commissioner may require the treasurer to include in his application a statement . . . setting forth such information appearing in the records of the assessors and of the collector and tending to establish the validity of the tax titles on such parcels of land . . . . The statement . . . may be incorporated in his affidavit and, when recorded, shall be prima facie evidence of such facts.

"Upon the recording of the affidavit the treasurer may sell all the parcels included therein, severally or together, at public auction to the highest bidder, first giving notice of the time and place of sale by posting a notice of the sale in some convenient and public place in the town fourteen days at least before the sale . . . . The treasurer shall execute and deliver to the highest bidder whose bid has not been rejected as inadequate a deed without covenant except that the

foreclosure by sale of land of low value. The Batty Lot is, and at all relevant times has been, land of low value.[8] General Laws c. 60, § 79, as in effect at the relevant time, required the issuance and recording of an affidavit of the Commissioner of Corporations and Taxation that the value of the land in question was less than the statutory ceiling, see notes 7 and 8 *supra*, and was insufficient to meet the taxes, interest, and charges due thereon together with the expenses of a judicial foreclosure. The statute also required that notice of the time and place of the sale be given by posting a notice of the sale in some convenient and public place in the town at least fourteen days before the sale, but contained no requirement of any other form of notice before either the recording of the affidavit or the sale. Since 1963 (St. 1963, c. 201) publication in a newspaper has been required prior to sale, but the statute contains no requirement of notice to the assessed owners by mail. See *Guaranty Mort. Corp.* v. *Burlington*, 385 Mass. 411, 415-416 (1982) (effective termination of right to redeem under low value tax sale procedure requires issuance and posting of commissioner's affidavit and posting of notice of sale for fourteen days). General Laws c. 60, § 79, facilitates governmental collection of taxes by providing an expeditious, nonjudicial procedure for the sale of land of low value. The public interest "requires that land be taken for nonpayment of taxes and sold under such circumstances that the necessary revenue may be obtained." *Napier* v. *Springfield*, 304 Mass. 174, 177 (1939).

*Foreclosure of right of redemption of land in the normal course.* The requirements of G. L. c. 60, § 79, are in sharp

---

sale has in all particulars been conducted according to law. Such a deed shall not be valid unless recorded within sixty days after the sale. Title taken pursuant to a sale under this section shall be absolute upon the recording of the deed of the treasurer in the proper registry of deeds within such sixty days. . . ."

[8]General Laws c. 60, § 79, as in effect at the time of the two foreclosures of tax titles in question here, defined a parcel of low value as one which did not exceed $1,000 in value. See note 7 *supra*. A parcel of low value land is now defined as one which does not exceed $5,000 in value. G. L. c. 60, § 79, as amended through St. 1985, c. 89.

contrast to the more demanding procedures which apply to foreclosures not involving land of low value. See G. L. c. 60, §§ 65, 66 (interested persons must be notified by registered mail); *Boston* v. *James*, 26 Mass. App. Ct. 625, 628-630 (1988) (municipality has constitutional obligation to provide notice to taxpayers of petition to foreclose rights of redemption). See also *Christian* v. *Mooney*, 400 Mass. 753, 761 (1987) (how far municipality must search involves whether redemption of land is foreclosed in normal course or under procedure applicable to land of low value).

*Due process requirements.* In 1983, in *Mennonite Bd. of Missions* v. *Adams*, 462 U.S. 791 (1983), the United States Supreme Court addressed the issue of the notice required prior to a judicial foreclosure sale for failure to pay taxes. The Court held that the due process clause of the Fourteenth Amendment to the United States Constitution requires that a mortgagee be given notice by mail before foreclosure by sale of the mortgaged property. *Id.* at 798-800. The Court said that "[n]otice by mail or other means as certain as to ensure actual notice is a minimum constitutional precondition to a proceeding which will adversely affect the liberty or property interests of *any* [emphasis original] party . . . , *if its name and address are reasonably ascertainable*" (emphasis supplied). *Id.* at 800.

It is to be noted that, under Massachusetts law, a town board of assessors "must use 'reasonable diligence' to try to determine the owner" of real estate from records in the county's registry of deeds and registry of probate. *Robertson* v. *Plymouth*, 18 Mass. App. Ct. 592, 594 (1984), quoting from *Hardy* v. *Jaeckle*, 371 Mass. 573, 580 (1976). "Reasonable diligence, of course, varies with the circumstances." *Robertson* v. *Plymouth*, *supra.* In the case of land of low value, furthermore, less effort by a municipality to effect notice will constitute "reasonable diligence." See *id.* at 596 (noting that it is too burdensome for board to examine title to every parcel of low value land before sale, court held that town was not required to search probate records where most recent transfer of parcel recorded in county registry of deeds

was in 1852 and county probate records would not have shown owners at time of taking). See also *Hilde* v. *Dixon*, 16 Mass. App. Ct. 981, 983 (1983).

Prior to the *Mennonite* case, the Supreme Judicial Court had upheld the adequacy of notice by publication to protect the due process rights of a mortgagee of land of low value. *Guaranty Mort. Corp.* v. *Burlington*, 385 Mass. 411 (1982). After the *Mennonite* case, the Supreme Judicial Court stated in *Christian* v. *Mooney*, 400 Mass. 753, 761 n.10 (1987), appeal dismissed and cert. denied, 484 U.S. 1053 (1988), "The due process considerations stated in the *Mennonite* case cast some doubt at least on the reasoning in *Guaranty Mortgage Corp.* v. *Burlington*, [*supra* at 419] . . . ." We interpret that comment in *Christian* as addressing situations in which a mortgagee *of record* does not receive notice of a taking in spite of the fact that "*its name and address are reasonably ascertainable*" (emphasis supplied). *Mennonite*, 462 U.S. at 800. Without notice, a mortgagee would have no reason to suspect that its property interests might be affected. We do not, however, believe that the comment in *Christian* indicates that the Supreme Judicial Court intended to overrule *Guaranty* in its entirety; that is, we do not think the court intended the doubt it expressed in *Christian* to extend to low value land where the owners cannot readily be located by the town (the 1939 taking and 1942 foreclosure) and where the owner fails to pay taxes he knew to be due (the 1947 foreclosure) (compare *Guaranty*, 385 Mass. at 417 [owner on notice at time of title acquisition of unpaid taxes and taking of land by town]; contrast *Christian*, 400 Mass. at 760 [plaintiffs had no knowledge nor were they reasonably expected to know of tax taking or foreclosure proceeding]). See *Christian*, 400 Mass. at 761. Accord *Hilde* v. *Dixon*, 16 Mass. App. Ct. at 982-983; *Robertson* v. *Plymouth*, 18 Mass. App. Ct. at 596 (both decided after *Mennonite* but prior to *Christian*). We conclude that this case is governed by the rationale of *Guaranty* and, accordingly, we are unpersuaded by the due process challenge to the notice requirements of G. L. c. 60, § 79, as applied to the plaintiffs in this case.

*The 1939 taking and the 1942 foreclosure.* While an owner no doubt has due process rights which may be violated when his property is taken by a town without constitutionally adequate notice of nonpayment of taxes, the pivotal question in each case is what notice is due the owner. A relevant consideration is whether the names and addresses of the owners are "reasonably ascertainable" by the town. See the *Mennonite* case, 462 U.S. at 800. At the time of the 1939 taking and the 1942 foreclosure there was no deprivation of the due process rights of the plaintiffs[9] because their whereabouts could not have been reasonably ascertained. Angelina's estate had been probated but the whereabouts of the children was unknown, and Remi's estate had not been probated. There is no suggestion in the record that the plaintiffs could with reasonable diligence have been located. *Robertson v. Plymouth*, 18 Mass. App. Ct. at 594. Indeed, based on the facts before us, determining their whereabouts would have involved more than reasonable efforts by the town. See *Mennonite*, 462 U.S. at 798-800. By the time of the taking in 1939, the children, who had earlier moved from the family home to an orphanage, had already left the orphanage some six or seven years previously, and except for Joseph (see note 4 *supra*) the record does not indicate their whereabouts thereafter.

Our conclusion is reinforced by a careful reading of *Christian*. The same court that questioned the reasoning in *Guaranty* also observed that "[p]ractical considerations, as well as unknown owners' due process rights, have to be relevant in determining how far a municipality must search . . . ." *Christian, supra* at 761. We conclude that the process that was due the plaintiffs in the 1939 taking and the 1942 foreclosure did not include the obligation that the town search for people whose whereabouts were unknown. Compare *Robertson v. Plymouth*, 18 Mass. App. Ct. at 594-596. Contrast

---

[9]We here use "plaintiffs" to refer to the plaintiffs who were children of Angelina Lamontagne. One plaintiff, Germaine Lamontagne, is the wife of one of the children, Joseph, and asserts a claim only in relation to the second foreclosure.

*Bartevian* v. *Cullen*, 369 Mass. 819, 821-825 (1976) (taking invalid because demand not mailed to address on deed); *Pass* v. *Seekonk*, 4 Mass. App. Ct. 447, 451-452 (1976) (taking invalid where demand not mailed to administrator of estate at address on record); *Boston* v. *James*, 26 Mass. App. Ct. 625, 626, 628-629 (1988) (notice not mailed to address on deed). Cf. *Hardy* v. *Jaeckle*, 371 Mass. at 578-580. To impose such a heavy burden on a town would be impractical, unreasonable, and, in this case, perhaps futile. Compare *Boston* v. *James*, 26 Mass. App. Ct. at 629 ("duty according to particular circumstances to . . . consult public records or make other ordinary, simple inquiries"; property involved in decision was not land of low value). Moreover, the Land Court judge found that at the time of the taking the children who are the plaintiffs here "may have been on constructive notice of the same,"[10] and that the conveyance of the lot in 1942 was to the brother-in-law of plaintiff Blanche L. Silva. Compare *Hilde* v. *Dixon*, 16 Mass. App. Ct. at 981-982. We conclude that the plaintiff children of Remi and Angelina Lamontagne were not deprived of due process and that the first taking and foreclosure were valid.[11] As the plaintiffs' rights as children of Angelina were properly terminated by the foreclosure, the plaintiffs no longer had a right to notice of future takings.

*The 1944 taking and the 1947 foreclosure.* As noted previously, the owner of the property between June, 1942, and November, 1944, was Michael Silva, the plaintiff Blanche Lamontagne Silva's brother-in-law. On November 27, 1944, the town effected a taking of the Batty Lot for nonpayment of taxes assessed to Michael Silva for 1943.[12] In 1946, Jo-

---

[10]We note that although Remi Lamontagne died in 1930, the affidavit in the 1939 taking lists as unpaid only taxes for the year 1937 and not for preceding years.

[11]Although a recent case of the United States District Court, *In re Stacy*, 99 Bankr. Rep. 142, 151 (D.Mass. 1989), construing Massachusetts law, held that a sale of a parcel of low value land under G. L. c. 60, § 79, violated due process requirements, that case is distinguishable on its facts.

[12]The Land Court judge found that, as with the earlier taking, Joseph Lamontagne, Blanche L. Silva, and Lena L. Vitale "may have been on constructive notice" that the property was the subject of that tax taking.

seph and his wife Germaine Lamontagne acquired the Batty
Lot from Silva. After the affidavit to foreclose tax title to the
property was filed in February, 1947, the town conveyed the
lot to the Knightlys in April, 1947, by a treasurer's deed.
The treasurer's deed stated that Joseph and Germaine
Lamontagne, along with Michael Silva, had been served with
notice of the sale by registered mail under G. L. c. 60,
§ 80A. Section 80A, inserted by St. 1941, c. 594, § 3, pro-
vides that a statement contained in the treasurer's deed that
such service has been made "shall be prima facie evidence
thereof." Although Joseph Lamontagne testified that he did
not receive any notice relative to the property from the town
of Methuen in 1944 and that when he searched his records
he did not find anything relative to a tax taking of the prop-
erty, he did not testify that he did not receive notice of the
1947 sale by the town to the Knightlys. Moreover, Joseph, by
paying real estate taxes on the property in 1946, acknowl-
edged, as the Land Court judge found, "that such taxes were
then due and would remain so on an annual basis thereaf-
ter." Thus, unlike the mortgagees in the *Mennonite* and
*Guaranty* cases, who had no knowledge that taxes were due,
Joseph had actual knowledge that taxes on the property were
due. Compare *Hilde* v. *Dixon*, 16 Mass. App. Ct. at 982-
983.

Furthermore, as noted, the Land Court judge found that
there was no indication that, with the exception of this one
instance, Joseph or the other plaintiffs ever used, occupied,
rented out, visited, improved, or paid outstanding taxes on
the property between the time their parents died and the fil-
ing of this complaint in 1988. From the time Joseph paid
taxes in 1945 or 1946 (and the property was conveyed to the
Knightlys in 1947) until the plaintiffs brought this action,
more than forty years elapsed. Contrast *Bartevian* v. *Cullen*,
369 Mass. at 819, 820 (bill in equity filed same year plaintiff
learned of taking and foreclosure); *Boston* v. *James*, 26
Mass. App. Ct. at 630. "[W]hen the validity of tax titles is
put in question long after the event, it is appropriate for the
judge . . . to weigh the factor of time against those making

the challenge." *Robertson* v. *Plymouth*, 18 Mass. App. Ct. at 596, quoting from *Krueger* v. *Devine*, 18 Mass. App. Ct. 397, 402 (1984). See also *Robertson* v. *Foley*, 15 Mass. App. Ct. 967, 968 (1983). Contrast *Christian* v. *Mooney*, 400 Mass. at 753 (defense of laches not available because plaintiffs never had knowledge of tax taking or foreclosure); *Sheriff's Meadow Foundation, Inc.* v. *Bay-Courte Edgartown, Inc.*, 401 Mass. 267, 269-270 (1987) (limitations statute [G. L. c. 60, § 80C, see *infra*] cannot cure defect based on want of title). This period was twice that needed to acquire title through adverse possession. See G. L. c. 260, § 21; *Robertson* v. *Foley*, 15 Mass. App. Ct. at 968-969. The result is that the Knightlys acquired good title from the town and any right that Joseph and Germaine had was foreclosed without deprivation of due process.

*General Laws c. 60, § 80C.* Based on the record and the judge's findings, we conclude that the town made valid takings of the Batty Lot for nonpayment of taxes under the low value procedure and subsequently effected valid conveyances of the land so taken. We observe, however, that, even if the town had failed to comply with the valid notice requirements for foreclosure by sale of low value land, G. L. c. 60, § 80C,[13] would have allowed the appellants twenty years

---

[13]General Laws c. 60, § 80C, inserted by St. 1986, c. 283, § 1, reads as follows:

"When any city or town has conveyed or sold any land under section seventy-nine or section eighty by an instrument in writing conveying or purporting to convey such land, and said instrument is duly recorded in the registry of deeds for the district wherein such land is situated and a period of twenty years elapses after the instrument is accepted for record, and the notice or procedure for the taking and sale or conveyance under this chapter or the instrument or record thereof because of a defect, irregularity, or omission, fails to comply in any respect with any requirement of law relating thereto or the instrument or record thereof shall, notwithstanding such defects, irregularities, or omissions be effective for all purposes to the same extent as though such notice or procedure or the instrument or record thereof had originally not been subject to any such defects, irregularities, or omissions, unless within said period of twenty years a proceeding is commenced on account of such defect, irregularity, or omission and notice thereof is duly recorded in said registry of deeds

from the time of recording an instrument of conveyance within which to challenge its validity for defective notice. See *Sheriff's Meadow Foundation, Inc.* v. *Bay-Courte Edgartown, Inc.*, 401 Mass. at 270 (statute designed to correct defects, irregularities, and omissions in procedure or in instrument of taking). The Land Court judge found, and we agree, that the twenty-year limitations period expired long before the filing of the complaint in this case.

*Judgment affirmed.*

and indexed and noted on the margin of said instrument of conveyance and in the event of such proceeding, unless relief is thereby in due course granted."

Section 2 of St. 1986, c. 283, made this provision applicable to instruments recorded prior to the effective date of the act.